Filed 9/1/15  P. v. Selena CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D065100 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCN305429) |
| CHRISTOPHER JAMES SELENA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Kathleen M. Lewis, Judge.  Affirmed.

Barbara A. Smith, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Collette Cavalier and Arlene A. Sevidal, Deputy Attorneys General, for Plaintiff and Respondent.

Christopher James Selena appeals a judgment following his jury conviction of the second degree murder of Fernando Arellano.  On appeal, he contends the evidence is

insufficient to support the jury's finding that he killed his victim with malice, as required for second degree murder.

## FACTUAL AND PROCEDURAL BACKGROUND

*Prosecution's case*. Selena met Shaquita Martinez in 2005 and they had two daughters. They lived together in Escondido. In January 2012, Selena was arrested for a misdemeanor and spent several months in jail. While he was in jail, Martinez began dating Fernando Arellano, but did not want to tell Selena about her relationship with him. After Selena's release from custody in April 2012, Arellano initially stopped visiting Martinez daily at her house, but eventually resumed visiting her there more often.

After Selena's release from custody, a restraining order required him to stay at least 100 yards away from Martinez and her home. However, he violated that restraining order four times in April 2012. At about 6:00 a.m. on April 15, Selena entered Martinez's home looking for his ties. Because Martinez and Arellano were in bed together at that time, she told Arellano to hide in the bathroom and then made the bed. As Selena entered the bedroom, Martinez told him her sister was using the bathroom. Selena went downstairs, but returned and saw Arellano in the bathroom. Selena took Arellano's laptop computer and cell phone from the nightstand and left the house. After Martinez called Selena's father regarding those items, Arellano's laptop was returned in a damaged condition.

On April 16, Martinez's sister saw Selena taking property from Martinez's garage and called police for violation of the restraining order. On April 22, Selena came to Martinez's home and asked her whether they could get back together. She refused and

2

closed the door because Arellano was inside her home.  From the side of the house, Selena stated, "I know he's in there."  At the time, Arellano was hiding in a closet because he was afraid of Selena.  Selena then threw two bricks through windows and doors, breaking their glass.

Selena sent text messages to Martinez in violation of the restraining order, expressing his love for her and stating that he forgets she no longer loves him.  One of his text messages stated: "Turn off my love for you despite all dudes you been with lately.  My love for you was all the way to my core.  I'm trying to push it out.  Hopping from one person to the next isn't as easy for me as it is for you.  I might not have shown it, but I loved you deeply.  You must be busy.  One thing that will cure me is to beat the shit out of Fernando [Arellano].  Just don't tell on me.  He won't be around in five years.  I still will."  Another text message he sent her stated: "Can I visit without somebody calling on me?  Is that a yes?  You got that little fucking pussy upstairs right.  I'm getting more pissed.  Everybody so flakey so I gotta get sneaky huh to get that pussy bastard.  You hiding him upstairs.  All right.  No warning shots."  Martinez did not reply to any of his text messages.

Noel Rivera was a friend of both Selena and Arellano.  After Selena was released from custody, he went to Rivera's house three times looking for Arellano.  On May 3, the third time, Selena appeared upset and told Rivera to tell Arellano that he (Selena) did not want to see him at Martinez's house again.  He told Rivera he would set Arellano's RV on

fire. Selena took a knife out of his pocket and told Rivera that if he saw Arellano near Martinez's house, he was "going to stab him in the eye."[1]

A few weeks before the killing, Selena told his father he had told Arellano to stay away from his children or he would stab him in the eye. Two to three weeks before the killing, Arellano's uncle saw Selena slowly drive several times past the trailer in which Arellano lived. When his uncle told Arellano about Selena's driving by his trailer, Arellano appeared "a little nervous."

On May 4, Martinez went to the home of Richard and Millie Montanez because her home's hot water heater was broken. Richard and Millie went to Martinez's home and saw Arellano there. There was tension between Martinez and Arellano because she had loaned him $300 to $400 for methamphetamine and he apparently had not given her the drugs or returned her money. When Martinez asked Arellano about the money, he did not take her seriously and she threw a pizza at him in anger. Arellano got mad and called someone to come over to the house and slap Martinez.[2] Martinez was angry with Arellano and asked him to leave her home. When he refused, Martinez called Selena, who did not answer, and left a message for him, stating: "You promised me you want to do something and you haven't taken fucking action yet. I'm going to have to do it myself."

---

[1]    Richard Faucher, Rivera's neighbor, testified Rivera described the knife Selena pulled out as a Roman gladius or a short sword with a white handle. However, at trial Rivera testified the knife was a table or butter knife.

[2]    Millie testified Arellano then told the person, "Nevermind."

4

At about midnight, Martinez returned to Richard and Millie's house because she did not want to be around Arellano. Arellano later arrived at their house to get Martinez. Arellano and Martinez walked home together, joking and laughing.

At 3:23 a.m. on May 5, Martinez called Selena and told him "he was still there and he wouldn't leave the house."[3] She told Selena that Arellano owed her money, had not paid her back, and told some girl to come over and slap her. Selena asked her, "If I come over there, are you going to tell [i.e., call the police again]?" At that time, Arellano was sitting on the bed in the master bedroom, administering first aid to his finger and fixing his rosary. Martinez ran water in the bathtub and fell asleep in it. When she woke up, she heard scuffling and grunting in the master bedroom. She saw Selena lunge from the bedroom door toward the bed where Arellano was sitting. She saw Arellano "punching the air" in a fighting motion. The struggle lasted about one minute. She got out of the tub and saw Arellano on the floor by the window. He looked injured and paralyzed. She did not help him because she did not know what to do or who was in the room. Instead, Martinez went to her daughters' bedroom and got in bed with one of them. Selena knocked on the bedroom door, opened it, and motioned for Martinez to come out into the hall. In the hall, he told her to "tell the police it was somebody else that came in here, a friend of Fernando [Arellano]." He said to tell police "a black guy did it." He told her

---

3    Although Martinez was referring to Arellano, she did not remember identifying him during her telephone conversation with Selena.

Arellano was dead. Selena's arm was bloody, but he appeared calm, composed, and not stressed. He left the house through the garage.

Martinez ran to Richard and Millie's house and told Millie that Selena had killed Arellano. Martinez asked Millie to go back to her house. Richard said she could not and called 911. Martinez asked him to say that some "unknown black man had committed the stabbing."

At about 4:30 a.m. on May 5, police arrived at Martinez's home and found Arellano lying on his back on the floor of the master bedroom between the bed and the wall. Arellano had sustained multiple stab wounds, was holding a rosary in his right hand, and was dead. Police observed bloodstains on the pillowcase, bed frame, and comforter. They found other bloodstains in the master bedroom, in the loft outside that bedroom, on the kitchen counter, and in the garage. They found blood spatter on the window blinds and the curtain in the master bedroom. They found a glass pipe and a little plastic bindle in Arellano's pants and drug paraphernalia and little baggies scattered around the bedroom. There was water in the master bathtub. They did not find Arellano's cell phone or wallet.[4]

Police found Selena's vehicle at his workplace in Vista. They approached Selena while he was near his vehicle and detained him. A laptop inside his workplace showed a recent search history of "Escondido Breaking News." Selena had a small abrasion on his right hand. The seats of his vehicle appeared to have been recently cleaned. On Selena's

---

[4]     Arellano's cell phone was later recovered from a person who got it from Martinez.

sweatshirt, police found two bloodstains—one on the back and one on the right sleeve. The blood on the back of the sweatshirt matched Arellano's DNA; Selena and Martinez were excluded as possible contributors.

Blood matching Arellano's DNA was found on the floor near the bed, on top of the dresser, on the floor near the dresser, on the floor near the entry to the bedroom, and on the floor of the loft outside the bedroom. Selena and Martinez were excluded as possible contributors to that blood.

An autopsy showed Arellano suffered 17 sharp-force injuries, including stab wounds and incise wounds. Three stab wounds penetrated his mid-right chest cavity to depths of four to four and one-half inches, which wounds caused life-threatening injuries to his lungs, aorta, pulmonary artery, and left anterior descending coronary artery. Arellano also suffered stab wounds on his shoulder, on his arm and into his chest (penetrating his chest cavity and injuring his lung), and to his thigh, as well as incise wounds or cuts to his forearm and a knuckle. Arellano's injuries were consistent with a folding or pocket knife as their cause. Toxicology testing found methamphetamine and the metabolite amphetamine in Arellano's blood. However, those drugs did not contribute to his death. His cause of death was multiple stab wounds.

*Information*. An amended information charged Selena with the first degree murder of Arellano (Pen. Code, § 187, subd. (a)).[5] It also alleged that in committing that offense Selena personally used a deadly weapon (§ 12022, subd. (b)(1)) and that he had

---

[5] All statutory references are to the Penal Code.

served a prior prison term (§§ 667.5, subd. (b), 668). At trial, the prosecution presented evidence substantially as described above. Martinez testified after being given use immunity and derivative use immunity for her testimony.

*Defense case*. Selena testified in his own defense. He admitted violating the restraining order by entering Martinez's house on April 15, 2012, to pick up clothing. He testified he took Arellano's laptop and cell phone as collateral for some of his missing property. On April 22, he went to Martinez's house to return some of her property and give some clothing to his daughters. Martinez was partying and prevented his daughters from visiting with him. Selena described the text messages he sent to Martinez as meaning to get her attention and intimidate her because he was afraid for his daughters' welfare. When he stated in a text that he had to "get sneaky," he was referring to calling Child Protective Services about his daughters' welfare. When he threw bricks through Martinez's windows and doors, he did so to call attention to her house and make it look like a crack house. Selena admitted asking Rivera to tell Arellano not to come to the house anymore. He admitted he told Rivera he would burn down Arellano's trailer under certain circumstances. Selena denied threatening to stab Arellano in the eye or having a knife or gladius with him. However, he admitted he carried a triangle-shaped box cutter and a folding knife with a four-inch long blade, both of which were clipped to his belt.

After he was released from custody, Selena decided he needed to move on from his relationship with Martinez and had two dates with Daniela Pumarejo, a woman he met at the gym. On May 4, 2012, he and Pumarejo went to Carlsbad, but her tires went flat after driving over a spike strip and her car was towed to a car repair shop in

8

Escondido. While they were at the repair shop, Selena received the telephone call from Martinez asking for his help. Martinez told him a person took all of her money, would not leave, and called people to come and beat her up. However, Martinez never identified that person to him as Arellano. Martinez said she would leave the garage door unlocked for him. Despite the restraining order, he went to Martinez's house because he was thinking about her and his daughters.

On Selena's arrival, Martinez's house was dark and quiet. Selena had his folding knife clipped onto his belt. He saw a light on in the master bedroom and someone hunched over the side of the bed as if he was tying his shoes. He did not recognize the person as Arellano. When the person got up and jumped on the bed, Selena dove and tackled him. They fought on top of the bed. Selena heard objects clattering, pushed the person off, and pulled out his knife. He then recognized the person as Arellano, but did not know whether other people would come to the room. Arellano started swinging at Selena with "haymaker punches." Selena then stabbed Arellano in the knee with his knife. Not seeing any reaction or blood from Arellano, Selena stabbed Arellano four times in the shoulder. When Arellano kept swinging his arms at him, Selena decided to stab him in the chest. When Arellano's face changed, Selena knew he was wounded. When Selena heard footsteps, he went downstairs but found no one. Returning upstairs, Selena saw water all over the floor. Arellano was sitting up. Selena went to his daughters' bedroom, knocked on the door, and saw Martinez sitting on a bed with their daughter. When he asked Martinez what was wrong, she replied, "I need help getting my

stuff," which he understood as meaning her money and dope. When he said no, she told him to leave.

Although Selena knew Arellano was wounded, he did not call 911. He thought Martinez would call for help. Selena denied he told Martinez to say a black man had come to her house. Selena left Martinez's house, went to his workplace, and fell asleep in his car. He closed the knife he used to stab Arellano and threw it in a bush in front of his car. He went inside and performed a computer internet search for "Escondido Breaking News."

Clark Smith, a physician specializing in addiction psychiatry, testified for the defense on the effect of methamphetamine on a person's brain. Methamphetamine causes overstimulation, overloads the brain's capacity to handle information, and causes the brain to shut down production of adrenaline. It can cause severe psychosis, confusion, visual distortion, reality distortion, and suggestibility. Arellano's toxicology results showed he had 2.5 milligrams of methamphetamine per liter of blood—a toxic level that is "extremely high" and four times higher than the level at which a person usually exhibits irrational and violent behavior. At that level, it was possible for a person, who had not eaten or slept that day, to react violently when a person unexpectedly appeared in a room. It is also possible the person would engage in a fight believing he or she had more strength and continue fighting, unaware of his or her injuries. However, Smith did

not know Arellano's level of tolerance and did not speak with Arellano's family and friends about how he acted while on methamphetamine.[6]

The jury found Selena guilty of second degree murder and found true the allegation he personally used a knife in committing that murder. Selena admitted the truth of the allegation he had a prior prison conviction. The trial court sentenced Selena to a total term of 17 years to life in prison, consisting of a 15-year-to-life term for second degree murder, a consecutive one-year enhancement for the personal weapon use allegation, and a consecutive one-year enhancement for the prior prison conviction allegation. Selena timely filed a notice of appeal.

DISCUSSION

I

*Substantial Evidence Standard of Review*

When a defendant challenges a criminal conviction on appeal based on a claim of insufficiency of the evidence, "the reviewing court's task is to review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11, citing *People v. Johnson* (1980) 26 Cal.3d 557, 578.) "Resolution of conflicts and inconsistencies in the testimony is the exclusive

---

6    Millie testified she saw no change in Arellano's behavior when he used methamphetamine and that he was a peaceful person. Likewise, Martinez testified she saw no change in Arellano's behavior when he used methamphetamine.

11

province of the trier of fact.  [Citation.]  Moreover, unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction."  (*People v. Young* (2005) 34 Cal.4th 1149, 1181.)

The substantial evidence standard of review involves two steps.  "First, one must resolve all explicit conflicts in the evidence in favor of the respondent and presume in favor of the judgment all *reasonable* inferences.  [Citation.]  Second, one must determine whether the evidence thus marshaled is substantial.  While it is commonly stated that our 'power' begins and ends with a determination that there is substantial evidence [citation], this does not mean we must blindly seize any evidence in support of the respondent in order to affirm the judgment. . . .  [Citation.]  '[I]f the word "substantial" [is to mean] anything at all, it clearly implies that such evidence must be of ponderable legal significance.  Obviously the word cannot be deemed synonymous with "any" evidence. It must be reasonable . . . , credible, and of solid value . . . .'  [Citation.]  The ultimate determination is whether a *reasonable* trier of fact could have found for the respondent based on the *whole* record."  (*Kuhn v. Department of General Services* (1994) 22 Cal.App.4th 1627, 1632-1633, fns. omitted.)  "[T]he power of an appellate court *begins* and *ends* with the determination as to whether, *on the entire record*, there is substantial evidence, contradicted or uncontradicted, which will support the determination, and when two or more inferences can reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions for those of the trial court.  *If such substantial evidence be found, it is of no consequence that the trial court believing other evidence, or*

*drawing other reasonable inferences, might have reached a contrary conclusion*."
(*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873-874.)

The standard of review is the same in cases in which the prosecution relied primarily on circumstantial evidence. (*People v. Bean* (1988) 46 Cal.3d 919, 932.) In applying the substantial evidence standard of review to cases primarily involving circumstantial evidence, *Bean* stated: "Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court[,] which must be convinced of the defendant's guilt beyond a reasonable doubt. ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment." ' " (*Id*. at pp. 932-933.) "Circumstantial evidence may be sufficient to connect a defendant with the crime and to prove his guilt beyond a reasonable doubt." (*People v. Pierce* (1979) 24 Cal.3d 199, 210.)

## II

### *Murder and Voluntary Manslaughter Generally*

Murder is the unlawful killing of a human being with malice aforethought. (§ 187, subd. (a).) Malice may be either express or implied. (§ 188; *People v. Knoller* (2007) 41 Cal.4th 139, 151.) Malice is express when there is an unlawful intent to kill. (§ 188 [defining express malice as "a deliberate intention unlawfully to take away the life of a fellow creature"]; *People v. Blakeley* (2000) 23 Cal.4th 82, 87.) "Malice is implied when

13

the killing is proximately caused by ' "an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life." ' [Citation.]  In short, implied malice requires a defendant's awareness of engaging in conduct that endangers the life of another—no more, and no less."  (*Knoller*, at p. 143.) "Second degree murder is defined as the unlawful killing of a human being with malice aforethought, but without the additional elements—i.e., willfulness, premeditation, and deliberation—that would support a conviction of first degree murder."  (*People v. Nieto Benitez* (1992) 4 Cal.4th 91, 102, italics omitted.)

Voluntary manslaughter is a lesser included offense of murder.  (*People v. Cole* (2004) 33 Cal.4th 1158, 1215.)  It is defined as the "unlawful killing of a human being without malice . . . [¶] . . . upon a sudden quarrel or heat of passion."  (§ 192, subd. (a).) The heat of passion requirement has both objective and subjective components.  (*People v. Steele* (2002) 27 Cal.4th 1230, 1252.)  A killing during a sudden quarrel or heat of passion occurs if the killer's reasoning was actually obscured as a result of a strong passion aroused by provocation sufficient to cause an ordinary person of average disposition to act rashly or without due deliberation and reflection and from that passion rather than from judgment.  (*People v. Breverman* (1998) 19 Cal.4th 142, 163; *People v. Manriquez* (2005) 37 Cal.4th 547, 583-584.)

In addition to a sudden quarrel or heat of passion killing, a "killing committed because of an unreasonable belief in the need for self-defense is voluntary manslaughter, not murder."  (*People v. Elmore* (2014) 59 Cal.4th 121, 129.)  That unreasonable self-

14

defense, or "imperfect self-defense," obviates malice because that mental state cannot coexist with an actual belief that the killing was necessary to defend one's self from death or serious injury. (*Id*. at pp. 129-130; *People v. Beltran* (2013) 56 Cal.4th 935, 951.) Alternatively stated, a killing with an actual, but unreasonable, belief in the need for self-defense is voluntary manslaughter. (*Elmore*, at p. 133.) Accordingly, "[t]wo factors may preclude the formation of malice and reduce murder to voluntary manslaughter: heat of passion and unreasonable self-defense." (*Ibid*.)

## III

*Substantial Evidence to Support Selena's Conviction of Second Degree Murder*

Selena contends his conviction for second degree murder must be reversed because the evidence is insufficient to support the jury's finding he killed Arellano with malice. He argues the evidence showed he was guilty only of voluntary manslaughter under a theory of either heat of passion or unreasonable self-defense.

Based on our review of the record, we conclude there is substantial evidence to support the jury's finding Selena killed Arellano with express malice—i.e., with the intent to kill him. Before the killing, Martinez had ended her relationship with Selena and began a relationship with Arellano. Selena's text messages to her showed he still loved her and was upset she was seeing Arellano. He told her he would "beat the shit out of [Arellano]" and had to "get sneaky . . . to get that pussy bastard. . . . No warning shots." He also told her he would be around in five years, but Arellano would not. On one occasion, Selena threw bricks into her house, knowing Arellano was inside. Selena also conveyed threats to Arellano through Rivera. He told Rivera that if Arellano did not stay

15

away from Martinez's house, he would set Arellano's RV on fire. In Rivera's presence, he displayed a knife and stated he would stab Arellano in the eye. Selena also made similar statements to his father. The evidence shows Selena bore ill will toward Arellano and had threatened to stab him.

Furthermore, the evidence, including that found at the crime scene and showing Arellano's injuries, supports a reasonable inference that Selena intended to kill Arellano. When Selena arrived at Martinez's house, Arellano was sitting on the bed alone, administering first aid to his fingers and fixing his rosary. The blood found on the bed supports a reasonable inference that Selena stabbed Arellano while he (Arellano) was sitting on the bed. The jury could also infer Selena did so without any actions by or words from Arellano (i.e., without either provocation or an actual belief in the need for self-defense). Based on the quiet and dark nature of Martinez's home and Arellano's position, i.e., sitting on the bed, the jury could reasonably infer Selena did not, in fact, have an actual, or good faith, belief he or others (e.g., Martinez or his daughters) were in imminent danger, thereby requiring self-defense actions. There was no evidence showing Arellano had any weapons. Also, Arellano was physically much smaller than Selena, and had shown his fear of Selena in the past by hiding in a closet and a bathroom. Although Selena testified Arellano started throwing "haymaker punches," the jury could reasonably infer those actions did not, in fact, make Selena actually believe he needed to defend himself by stabbing Arellano multiple times. Instead, the jury could infer Selena, by reason of his larger physical status and boxer training, did not fear Arellano or his haymaker punches, or actually believe in the need for self-defense.

16

The nature and circumstances of Arellano's stab wounds also support the jury's finding Selena acted with malice in killing him. The record shows Selena stabbed Arellano at least 15 times with a knife and killed him. Selena stabbed Arellano in the knee, in the thigh, four times in the shoulder, and four times in the chest. The stab wounds to his chest were four to four and one-half inches deep and caused life-threatening injuries to Arellano's lungs, aorta, pulmonary artery, and left anterior descending coronary artery. Based on the nature of the knife attack and location and depth of each stab wound, there is substantial evidence to support the jury's finding that Selena stabbed Arellano with the intent to kill him, thereby satisfying the malice requirement for murder. (Cf. *People v. Bolden* (2002) 29 Cal.4th 515, 560-561 [single stab wound, five to six inches deep, to victim's back that penetrated victim's lungs and spleen supported inference that defendant had an intent to kill]; *People v. Moore* (2002) 96 Cal.App.4th 1105, 1114 [defendant stabbed victim in abdomen, an extremely vulnerable area, supporting inference defendant had a specific intent to kill].) Furthermore, the number of stab wounds (i.e., at least 15) inflicted on Arellano supports an inference Selena intended to kill him and did not act in self-defense. (Cf. *People v. San Nicolas* (2004) 34 Cal.4th 614, 658 [jury could conclude defendant intended to kill victim based on "sheer number of wounds on [her] body, many of which individually would have been fatal"]; *People v. Pride* (1992) 3 Cal.4th 195, 247 ["A violent and bloody death sustained as a result of multiple stab wounds can be consistent with a finding of premeditation."].) Finally, Arellano's defensive wounds (e.g., injuries to his forearm, knuckles, and calf) were consistent with his use of his arms and legs to defend

17

against Selena's vicious knife attack against him.  There is substantial evidence

supporting the jury's finding Selena intended to kill Arellano (i.e., had express malice).

To the extent Selena argues there is substantial evidence that would have

supported a contrary finding (i.e., that he did not have an intent to kill), he misconstrues

and/or misapplies the substantial evidence standard of review.  (*People v. Rodriguez*,

*supra*, 20 Cal.4th at p. 11; *People v. Johnson*, *supra*, 26 Cal.3d at p. 578; *People v.

Young*, *supra*, 34 Cal.4th at p. 1181; *Kuhn v. Department of General Services*, *supra*, 22

Cal.App.4th at pp. 1632-1633.)  "[T]he power of an appellate court *begins* and *ends* with

the determination as to whether, *on the entire record*, there is substantial evidence,

contradicted or uncontradicted, which will support the determination, and when two or

more inferences can reasonably be deduced from the facts, a reviewing court is without

power to substitute its deductions for those of the trial court.  *If such substantial evidence

be found, it is of no consequence that the trial court believing other evidence, or drawing

other reasonable inferences, might have reached a contrary conclusion*."  (*Bowers v.

Bernards, supra,* 150 Cal.App.3d at pp. 873-874); see *People v. Ochoa* (1993) 6 Cal.4th

1199, 1206; *People v. Harris* (2013) 57 Cal.4th 804, 849-850; *People v. Livingston*

(2012) 53 Cal.4th 1145, 1170.)

Assuming arguendo there is sufficient evidence to have supported a contrary

finding by the jury (e.g., that Selena killed Arellano in a heat of passion or in

unreasonable self-defense), that does not show the evidence is insufficient to support the

jury's finding that Selena killed Arellano with malice.  Although Selena argues, at great

length, that the evidence could support inferences he killed Arellano in a heat of passion

18

or in unreasonable self-defense, that argument does not refute or disprove the evidence and inferences therefrom supporting the jury's finding that he killed Arellano with malice and not in a heat of passion or in unreasonable self-defense. The jury could reasonably infer Arellano's methamphetamine blood level at the time of the killing did not cause him to attack or otherwise provoke Selena. There was evidence Arellano was a peaceful person, even when he used methamphetamine. Furthermore, although Martinez called Selena before the killing and asked him to come over to her house because Arellano owed her money, had not paid her back, and told a person to come over and slap her, the jury nevertheless could infer Selena did not, based on that call, actually believe he needed to defend Martinez or his daughters from any imminent danger of death or serious injury or that he was so provoked by Arellano that he killed him in a heat of passion.

## DISPOSITION

The judgment is affirmed.

McDONALD, Acting P. J.

WE CONCUR:

O'ROURKE, J.

AARON, J.

19